UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **DEIGHAN LAW, LLC.** )<br>)<br>**Appellant,** )<br>)<br>v. )<br>)<br>**DIANA DAUGHERTY,** )<br>)<br>**Appellee.** ) | Case No. 4:19-CV-02506-SNLJ |

## MEMORANDUM AND ORDER

This is an appeal from a decision by the Bankruptcy Court directing appellant Deighan Law, LLC, to disgorge attorneys' fees paid to it in a Chapter 13 bankruptcy proceeding. *In Re Laura Inez Richard*, 2018 WL 5733508 (Bankr. E.D. Mo. Oct. 10, 2018). By agreement of the parties, this appeal is consolidated with five other cases presenting identical issues, all involving the Chapter 13 Trustee's successful motions for disgorgement of attorneys' fees against Deighan Law.[1] This Court has jurisdiction. 28 U.S.C. § 158(a)(1). For the reasons that follow, the decision is **REVERSED**.

The ultimate issue in the case is whether Deighan Law, d/b/a UpRight Law, engaged in impermissible fee sharing by engaging local lawyers to represent Deighan Law clients in Chapter 13 bankruptcy cases. Section 504 of the Bankruptcy Code

---

[1] *Deighan Law Deighan Law LLC v. Diana Daugherty* (*In re Chiquetta Hunter*), No. 4:19-cv-02521; *Deighan Law LLC v. Diana Daugherty* (*In re Luis Flores*), No. 4:19-cv-02522; *Deighan Law LLC v. Diana* Daugherty (*In re Bennie Rae and Elizabeth Mae Bratcher*), No. 4:19-cv-02523; *Deighan Law LLC v. Diana Daugherty* (*In re Bethany F. Prince*), No. 4:19-cv-02524; and *Deighan Law LLC v. Diana Daugherty* (*In re Larry and Judith Ohlau*), No. 4:19-cv-02525. Appellees are the Chapter 13 Trustee and the Acting United States Trustee.

1

prohibits the sharing of compensation paid to attorneys that is allowed as an administrative expense under sections 503(b)(2) and 330(a). 11 U.S.C. § 504. An exception to the prohibition is that "[a] member, partner, or regular associate in a professional association, corporation, or partnership may share compensation . . .with another member, partner, or regular associate in such association, corporation or partnership. . . ." 11 U.S.C. § 504(b)(1). Thus, the case turns on the narrow question of whether Deighan Law and the local lawyers are members of the same professional association, corporation or partnership—in other words, whether they are members of the same law firm.

## FACTS

Because resolution of this case is intensely fact-specific, an extended review of the record is necessary.

### A.

The case was submitted on a Joint Stipulation of Facts, summarized as follows:

Deighan Law is an Illinois limited liability company registered in the state of Missouri as a foreign company with authority to engage in commerce there. Deighan Law does business in Missouri under the registered name UpRight Law LLC. (hereinafter "UpRight Law"). UpRight Law is headquartered in Chicago, Illinois. At the time relevant to this appeal, it had three general partners and approximately 300 limited partners—all attorneys.

The Bankruptcy Court's decision involved defining the precise relationship between three St. Louis limited partners—Michael Doyel, John Caraker, and Andrew

2

Magdy—and UpRight Law. As is required of all limited partners, all three executed a partnership agreement with UpRight Law. Each is described as a "non-equity, non-voting member[] of UpRight Law." None of them are entitled to vote at partnership meetings. None have a "right to participate in management of the firm," and the relevant agreements emphasize that each "Partner's status as a Partner does not render Partner an owner, equity holder, or partner in [UpRight Law]." In fact, each operates their own law firm in addition to, and independently of, their association with UpRight Law.

The partnership agreements go on to allocate the duties and responsibility of the local attorneys and UpRight Law. Under the agreements, UpRight Law performs the following duties:

- Serves as the initial contact for new client calls;

- Schedules and confirms retention appointments;

- Prepares intake forms and other agreements related to the retention meeting;

- Fields calls from clients, creditors, and opposing counsel;

- Collects and processes client payments;

- Refers client inquiries, and opposing counsel or creditor calls to the local Upright Law attorneys;

- Provides staff attorneys or legal professionals to assist with certain legal inquiries that are not state specific;

- Obtains legal malpractice insurance for losses related to the cases in which its attorneys provide representation;

- Makes regular fee distributions to its attorneys; and

- Provides regular accountings to its attorneys.

In addition to those duties, UpRight Law also provides the following services to its limited partners:

> • Prepares and distributes annual IRS Schedule 1065 K-1 partner distribution tax forms, reporting partner distributions made in the prior year;
>
> • Purchases and delivers business cards reflecting its attorneys' relationship with Upright Law;
>
> • Procures and licenses case management software that its attorneys use to track activities on Upright Law cases;
>
> • Licenses bankruptcy petition preparation software, installed on Upright Law's servers and accessed remotely by its attorneys to prepare Upright Law cases;
>
> • Hosts partnership meetings via virtual meeting room at least once every sixty (60) days;
>
> • Hosts an annual partnership meeting; and
>
> • Handles various administrative functions for its attorneys, such as: fielding administrative questions from clients, performing all accounting functions, collecting fees from clients, handling creditor verification calls, purchasing advertising for Upright Law, marketing Upright Law's services, responding to consumer inquiries for legal services, hiring and employing Upright Law employees, training Upright Law employees, managing Upright Law employees, providing human resources management and benefits, managing Upright Law's finances and other administrative functions.

The duties and responsibilities of each limited partner includes:

> • Notifying clients acquired by Upright Law and third parties of its relationship with Upright Law;
>
> • Notifying Upright Law whether there is an existing or potential conflict of interest in client representation;
>
> • Availability for new client consultations on a weekly basis and coordinating with Upright Law to schedule same;

- Sharing all work product generated by the partner of UpRight Law, including bankruptcy petitions, schedules, Chapter 13 plans, court pleadings, motions and discovery requests, and when necessary, reviewing any such work product generated by Upright Law;

- Recording times spent and tasks concluded by the partners in Upright Law's database, providing updates pertinent to each case in the database, and creating uploading digital copies of all documents gathered into the database;

- Forwarding and/or uploading all notices and correspondence to Upright Law and to clients' records in the database;

- Providing client consultation and advising or consulting with clients about all matters related to the case;

- Engaging support staff, as needed, for post-petition tasks; and

- Conducting all work related to the case, including preparing and filing a bankruptcy petition and plan, fulfilling all trustee document requests, appearing at all hearings and other work required to obtain a discharge of debt under Chapter 7 or 13.

In addition to those duties, each limited partner has certain privileges and responsibilities that include, but are not limited, to the following:

- Attorneys are invited to attend partnership meetings that are hosted via a virtual meeting room at least every sixty (60) days and are invited to attend an annual partnership meeting of Upright Law;

- Attorneys are entitled to a share of a profit-sharing pool, along with all other Missouri licensed attorneys of Upright Law, based on all profits derived in the State of Missouri;

- Attorneys receive bi-weekly distributions of their respective share of fees from Upright Law that are deposited into an account in the attorney's personal name, and not into the account of any other law firm;

- Attorneys receive an IRS Schedule 1065 K-1 partner distribution tax form at the start of the year;

- Attorneys disclose all payments made by a debtor in a case to Upright Law on the Statement of Financial Affairs, properly disclose the compensation received by Upright Law on the Compensation Statement, and sign each Voluntary Petition under his own name as "Partner, Upright Law LLC"; and

- Attorneys are required to disclose Upright Law's co-location on the debtor's voluntary petition.

In working for UpRight Law, each limited partner must obtain a second CM/ECF login, which Doyel, Caraker, and Magdy did, here, as reflected "in pleadings and documents filed in the Consolidated cases." Initial fees are collected by Upright Law, and a "subsequent allocation of earned fees between Upright Law and [its attorneys]" takes place thereafter. The agreements states that, in Chapter 13 cases, the limited partner "receive[s] one hundred percent (100%) of all post-petition fees distributed, provided that [they] perform[] all of the post-petition work as is required on the respective case."

In each of the consolidated cases, the named debtors engaged UpRight Law to provide legal services in connection with his or her Chapter 13 bankruptcy. The debtors each agreed to pay a flat fee of $4,000.00. The debtors made an initial pre-petition payment to UpRight Law, which was disclosed to the Bankruptcy Court through a Statement of Financial Affairs. In each case, the debtors' Chapter 13 plan provided for the balance in attorneys' fees to be disbursed to UpRight Law through the plan. The parties stipulated that Doyel, Caraker, and Magdy took the following actions in the consolidated cases:

- performed client consultations;
- collected client pay advices, tax returns, and other due diligence documents;
- prepared and filed the petition, plan, and schedules;

6

- appeared at the meeting of creditors; and

- appeared at the confirmation hearing.

**B.**

An addendum to the Joint Stipulation is the testimony of UpRight Law managing partner Kevin Churn from a hearing on August 9, 2016, "admitted into evidence without objection." That uncontroverted testimony is summarized in pertinent part as follows:

UpRight Law does business in all 50 states and the District of Columbia.

In addition to the three equity partners, there are "25 to 30 attorneys in the [Chicago] office," and "110-115 non-attorney staff members."

"[I]nitially most consumers contact [UpRight Law] through the Internet," doing "a search for bankruptcy attorney."

Upon receiving inquiries, non-attorneys called "first responders" assess the consumer's "interest in considering bankruptcy as an alternative," their "apparent ability to pay for legal services," and "whether all decision makers are present. . .in order to determine whether or not they'd want to proceed."

If those qualifications are met, the potential client is transferred to a "client consultant" who assesses in more detail the client's motivation level and explains "non-bankruptcy debt relief alternatives," the differences between Chapter 13 and Chapter relief, and similar matters. If the client is interested, the consultant "will gather intake information using a computer program designed by lawyers." Specifically, the consultant enters in "income, sources of income, household members, expenses, assets. . .

7

information that most attorneys would collect traditionally through a form that the consumer fills out in the reception area in their office."

At that point, the consultant will collect a partial fee of "$1500 up-front" and the client is transferred to "a Missouri licensed attorney on staff at our Chicago office." The staff lawyer then reviews with the client "all the facts that were gathered in the intake form," makes "certain required disclosures that are scripted out," and "creates an engagement agreement."

Next, the staff lawyer refers the client "for a consultation as immediately as possible" to the Missouri-licensed partner who will actually handle the case.

"[O]nce a client is paid in full, [the Missouri partner] collects all of the due diligence documents, prepares the petition and the plan, files the plan with the court, and really handles all of the post-filing work."

Thereafter, ECF filings "include[] notices at UpRightLaw.com," which staff and attorneys in Chicago monitor. And "if anything kind of slips through with [the Missouri partner]," UpRight Law "will monitor it out of Chicago."

If "issues come up with the U.S. Trustee, or the Chapter 13 trustee, [the Missouri partner] is free to involve the home office," which "provides what you might consider to be legal support services to the partners of the firm."

"[I]f there's any issues that . . . the local partner . . . does not know how to handle exactly, [the Chicago office] will provide support." In that regard, "a Chapter 7 panel trustee. . .is an equity partner of the firm." There is also "a great network of counsel across the country to assist us in any type or more complex matters that might arise."

8

The 300 or so limited partners across the country "have an average of about 22, 23 years' experience doing almost exclusively consumer bankruptcy work," and "the central office works as a great kind of networking knowledge base for the limited partners of the law firm."

"[I]f someone in Chicago can't assist" or if "specific analysis" is needed, the limited partner can be put "in touch with another limited partner within their state of licensure to make sure that . . . they get proper guidance."

## ANALYSIS

On appeal, there is no dispute about the pertinent facts—they've been stipulated to by the parties and were relied upon by the Bankruptcy Court. Accordingly, the standard of review is *de novo*. *See Walton v. LaBarge (In re Clark),* 223 F.3d 859, 862 (8th Cir. 2000).

On those stipulated facts, this Court is of the opinion that Doyel, Caraker and Magdy are indeed partners in a law firm with UpRight Law so that section 504(b)(1)'s exception to section 504(a)'s fee-sharing prohibition applies. Again, section 504(b)(1) states, "[a] member, partners, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 503(b)(4) of this title with another member, partner, or regular association in such association, corporation, or partnership[.]" In the absence of a definition for the terms "professional association, corporation or partnership," it is appropriate for this Court—as did the Bankruptcy Court—to draw on the Missouri Rules of Professional Conduct (which themselves draw on the ABA Model Rules) in the

9

context of Missouri's own limitations on fee sharing for lawyers. Those limitations, set out in Rule 4-1.5(e), apply only "between lawyers who are not in the same firm." The terms "firm" and "law firm" are defined in Rule 4-1.0(c) as "a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization." Mo. S. Ct. R. Prof'l Conduct Rule 4-1.0(c). Comment 2 to Rule 4-1.0 explains:

> Whether two or more lawyers constitute a firm within Rule 4-1.0(C) can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve.

Applying this guidance to the facts at hand, the general partners and the limited partners do indeed "present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm." UpRight holds out its local partners to its clients and to the public as UpRight Law attorneys. Critically, the limited partners identify UpRight Law as their law firm in the bankruptcy petitions, schedules, and statements they review with the clients and file with the Bankruptcy Court, and Upright Law even supplies business cards to the limited partners for that purpose.

10

Furthermore, there certainly is a "formal agreement between associated lawyers"—a formal partnership agreement the terms of which are set out in much detail in the stipulation of facts and the testimony of Kevin Chern. It is unnecessary to repeat those terms in total because a small summary will do. UpRight Law is a firm specializing in bankruptcy law that has three general partners and approximately 300 limited partners, all of whom are lawyers. There are also 25-30 staff attorneys in the home office in Chicago, providing legal services ancillary to the operation of the firm and its bankruptcy practice. There is an allocation of duties in that the general partners, through the home office, are in charge of marketing, client intake, referrals to the limited partners, and the entire business end of the firm, as well as providing an assortment of support services for the limited partners including legal assistance from the staff attorneys. The limited partners then handle the cases after the initial referral, including client consultations, the preparation and filing of pleadings, and all in-court work.

Finally, under Comment 2, the lawyers do "have mutual access to information concerning the clients they serve." As the Bankruptcy Court, itself, noted, "[l]ocal Attorneys use forms provided by Upright Law for their mutual clients, and both [the home office lawyers and the local lawyers] have access to files of these clients."

Again, these facts lead to the conclusion that UpRight law and its limited partners do constitute a law firm. Although the structure and operation of the firm is unconventional, this Court finds no authority that precludes it.

The Trustees' principal objection to all of this, and as stated in the Bankruptcy Court's decision, is that, "UpRight Law is holding itself out to the public in a manner that

11

strongly suggests that UpRight Law is nothing more than a lawyer referral agency that completes administrative screening work, then refers the case to attorneys to take on the legal work." It goes without saying the reason for the fee-sharing prohibition is that fee-sharing—when it consists of nothing more than the collection of referral fees—undermines the integrity of the bankruptcy process. Here, perhaps, it would be a closer case if there were no further interaction between the Chicago office and the local limited partners after the "hand off." But, the record shows the Chicago office continues to monitor the cases, supervises as necessary, and also provides legal assistance from staff lawyers and other partners as necessary. This alone makes UpRight Law more than a lawyer referral agency.

The Trustees' other concern, and again as set out in the Bankruptcy Court's opinion, is that there is a "lack of complete integration between UpRight Law and the practice of each of the Local Attorneys." The Bankruptcy Court then explains,

> The two ways each of the Local Attorneys hold themselves out to the public -- as affiliates or non-affiliates -- makes it difficult to conclude that the public has no visible way to distinguish them as separate legal entities. As long as the Local Attorneys continue to maintain practices separate and unaffiliated with UpRight Law in plain view of the public, they cannot be deemed to have suggested or conducted themselves as one law firm for purposes of Rule 4-1.0(c).

This ruling appears to be based on an unstated assumption that lawyers cannot be members of more than one law firm. There is no citation for that proposition, nor does this Court find any authority precluding lawyers from representing clients through two separate practices—one in which they hold themselves out as part of the same firm and

12

one in which they represent clients individually or through a separate firm with other attorneys. Furthermore, and as discussed, this Court disagrees that the public would have any real problem distinguishing the local lawyers' practice as a member of Upright Law from their practice as principals in their independent firms. It is wholly uncontroverted that when the local lawyers are representing clients as part of UpRight Law, they make it clear that they are doing so and that they are not representing the clients as part of their independent practice.

The Trustees raise two final points, both of which fail because they are directed to the operation of the firm rather than to the formation and existence of the firm. First, they complain, though again without citation, that the apparent lack of a system to check for conflicts of interest between the partners is indicative that the partners are not acting as a firm. But the partners are bound by the conflict of interest rules regardless of whether a conflict check system is in place, *see* Mo. S. Ct. R. Prof'l Conduct Rule 4-1.10. The presence or absence of such a system—and whether the partners actually abide by the conflict rules—has no bearing on whether the partners have combined to form a law firm in the first place. The second point, then, is that the so-called "first responders" in the Chicago office, elsewhere referred to as "sales executives," allegedly engage in "hard-sell tactics" in dealing with prospective clients. But this, too, involves only the operation of the firm, in that it is obviously a complaint about the propriety of the firm's marketing efforts. It bears mention as well that neither of these issues were much fleshed out in the record, nor did the Bankruptcy Court even mention them. In any event, these issues have nothing to do with this court's narrow ruling that a law firm exists.

## CONCLUSION

For the foregoing reasons, this Court holds that Deighan Law's limited partners are partners in a professional association, corporation or partnership who may share compensation under Section 504(b)(1). The decision of the Bankruptcy Court disgorging attorneys' fees paid is therefore reversed and the case is remanded for further proceedings consistent with this ruling.

So ordered this 14th day of April 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE